**FORSTMANN WOOLEN COMPANY,**
**Plaintiff,**

v.

**MURRAY SICES CORP., Defendant.**

United States District Court
S. D. New York.
Aug. 30, 1956.
Supplemental Opinion Sept. 24, 1956.

Gainsburg, Gottlieb, Levitan & Cole, New York City, for plaintiff, Samuel Gottlieb, Harold I. Cole, New York City, of counsel.

Lewis & Mound, New York City, for defendant, J. Norman Lewis, James P. Durante, New York City, of counsel.

McGOHEY, District Judge.

The plaintiff, claiming infringement of its copyrights and trade-marks and unfair competition, asks extensive injunctive relief, damages, an accounting and attorneys' fees.

The defendant denies infringement and unfair competition and pleads in defense that the plaintiff has been guilty of laches; that it has acquiesced in what the defendant has done and thus waived any claims it might otherwise have had; that in combination with others it has

used its trade-marks to create and maintain a monopoly in violation of the anti-trust laws. The latter charge is also pleaded in support of counterclaims for treble damages amounting to more than $1.75 million.

On an early pre-trial motion addressed to the pleadings, the Judge ordered that "the issues with respect to the counterclaims contained in the answer are severed and the issues of the complaint with respect to trade-mark infringement, copyright infringement and unfair competition shall be tried first." The latter issues, except that of copyright infringement which was withdrawn prior to trial, were the subject of the instant trial. The "issues with respect to the counterclaims contained in the answer" were not tried.

During cross-examination of the plaintiff's first witness, defense counsel spent considerable time and effort in attempting, unsuccessfully, to elicit testimony in support of the "monopoly" defense. Suddenly, after the trial had proceeded for more than a week and while the first witness was still on the stand, he moved to withdraw this defense.[1] The motion was opposed and decision was reserved. It was denied at the end of the plaintiff's case. The defendant thereupon rested without calling witnesses.

It will be convenient to incorporate the findings of fact and conclusions of law in this opinion. The former appear in the numbered paragraphs.

1. The issues involve the anti-trust and trade-mark laws of the United States and rights thereunder which exceed $3,000 in value. The plaintiff and defendant are, respectively, corporations of New Jersey and New York.

2. The plaintiff at all times here material and for many years before, manufactured and sold woolen and worsted fabrics at wholesale throughout the United States in competition with other manufacturers whose fabrics were equal in quality and renown to the plaintiff's.

3. The plaintiff has never required its customers to use only Forstmann fabrics. It has annually sold to several hundred customers, of whom all but two or three also bought and used fabrics made by other fabric manufacturers who were in competition with the plaintiff.

4. The plaintiff has never been, and has never held itself out to be, a manufacturer of garments. The plaintiff does not claim and did not offer to prove that purchasers of garments, whether at wholesale or retail, have ever believed it to be a manufacturer of garments. It has never sponsored or purported to sponsor any manufacturer of garments or his products.

5. The defendant at all material times manufactured and sold ladies' suits at wholesale throughout the United States.

6. Since 1904, the plaintiff's fabrics have been sold under the names "Forstmann" and "Forstmann Woolens."

7. The plaintiff is the owner of four trade-marks registered respectively on December 12, 1939, March 3, 1942, August 15, 1944 and October 3, 1944.

8. The first trade-mark reads "Forstmann Woolen—100% Virgin Wool." "Forstmann" is printed in Spencerian script. "Woolen" and "100% Virgin Wool" are printed in conventional block type. The word "Forstmann" appears on the line above "Woolen" and both are enclosed by a decorative border of scrolls, at the right of which appears the letters "F W Co" in script, with one solid star above and one below the letters.

9. The second trade-mark consists of the single word "Milateen" in distinctive block type.

10. The third trade-mark consists of the single word "Forstmann" in distinctive ornate type, superimposed on the outlines of three evenly spaced fleurs-de-lis.

11. The fourth trade-mark contains exactly what is in the third, plus "100 */*

---

1. Counsel made it quite clear that he was not moving to withdraw the counterclaims based on the alleged monopoly, but only the defense based on that charge.

Virgin Wool" in conventional block type, on a second line.

12. The plaintiff had the third and fourth trade-marks reproduced on heavy silk labels suitable for attachment in garments.

13. The plaintiff has no copyright in its labels. It was so held by Judge Galston in Forstmann Woolen Co. v. J. W. Mays, D.C., 89 F.Supp. 964, decided subsequent to the institution of the present action. Forstmann having noticed an appeal, later abandoned it.

14. The plaintiff furnished without charge to each of its customers a quantity of labels sufficient to provide one for each garment made from the fabrics purchased, subject to the following provisions of the standard contract between the plaintiff and its purchasers:

"All labels (copyrighted or which have reproductions thereon of any trademarks of Forstmann Woolen Co.) received by the Purchaser shall be upon the conditions as follows: The labels are not included as part of this sale; title to the labels is and shall always remain in Forstmann Woolen Co.; the Seller reserves the right to restrict the use of all such labels; the Purchaser's use of such label shall be only in garments of approved character, grade and quality made of the fabrics herein contracted for, to be sold in the Purchaser's regular course of business; the Purchaser shall not use, sell, assign, tranfer or dispose of the labels except as herein provided, and the Purchaser will account for and return all unused labels to the seller."

The containers in which the labels were enclosed bore the following statement:

"This carton contains woven labels the property of Forstmann Woolen Company.

"It is expressly understood that the right to use these labels is granted only to the manufacturer to whom we sell the merchandise and upon condition that he manufactures the goods so sold into garments for which these labels are supplied. If the goods are not manufactured into garments by the manufacturers who buy them from us, then the labels, being the property of the Forstmann Woolen Company, shall be returned to them.

"Should any Forstmann Woolens be sold by a manufacturer in the piece, the labels may not be transferred to the buyer, nor shall the buyer have the right to use them.

"The delivery and acceptance of these labels by the manufacturer is upon the above express conditions, the terms of which shall not be violated."

15. Some of the plaintiff's fabrics were made solely of wool. For these, the plaintiff provided labels which bore either the third or the fourth trade-mark. The plaintiff also made fabrics partly of wool and partly of other yarns, such as silk, cashmere, camel hair, rabbit hair, etc. For each of the latter fabrics the plaintiff provided labels which bore the third trade-mark plus a statement, in conventional block type, of the fabric's constituent yarns and their respective percentages.

16. At all times here material, all branches of the ladies' garment industry were classified in one of three general categories which are differentiated according to the quality and the price of the product or merchandise involved. The highest category is called the "better quality" and also the "high price," class. Below that is the "medium quality" which is also called the "popular price," class. At the bottom is the "cheap quality" which is also called the "low price" class.

17. Among the initiated, quality and price appear to be deemed equivalent standards and it is their common practice to denominate each class in terms of price.

18. Whether garments and, therefore, those who manufacture or sell them, fall in one or another of the three classes does not depend solely on the classification of the basic fabric used. It depends

also on the styling and design of the garments; the quality and cost of the complementary materials, i. e. the material used for lining, binding and trimming; and the quality of the tailoring.

19. The plaintiff and its fabrics are concededly in the "better quality" or "high price" class.

20. The plaintiff's name, trade-marks and labels have acquired substantial and valuable reputation and good will.

The plaintiff contends (a) that through its sales, advertising and publicity techniques it has succeeded in effectuating a policy of selecting as customers, manufacturers who make garments of *"high quality and style commensurate with plaintiff's fabrics;"* and (b) that because of this asserted success, its trade-mark bearing label has "become a symbol to consumers and purchasers throughout the country, and has achieved acceptance and recognition as connoting an *integrated product of high quality, namely, a superior fabric produced in a fine quality garment of high style and workmanship comparable to the standard of the fabric itself*." (Emphasis supplied.)

It is true enough, as subsequent findings show, that the plaintiff sold to "better quality" garment manufacturers and that many of these affixed the plaintiff's labels in their "better quality" garments. However, since all the plaintiff's fabrics are, as claimed by the plaintiff, in the "better quality" class, I read these contentions as in effect asserting that the plaintiff has sold *only* to manufacturers of "better quality" garments; that it has authorized use of its labels *only* in "better quality" garments; and that as a result the labels, which concededly signify "better quality" fabrics, have come also to signify "better quality" garments.

21. The only testimony offered in support of these contentions came from the plaintiff's officials. These were certainly not disinterested witnesses. And their testimony, especially that of Ellis and Huss, showed that it was based on but meager and superficial acquaintance with the reactions, if any, of "consumers and purchasers throughout the country" to the presence of the plaintiff's labels in garments. The plaintiff offered no testimony by wholesalers, retailers, consumers or others who might be expected to have reliable knowledge.

22. The offered testimony lacks sufficient weight to support the contentions which in the light of facts hereafter found are rejected.

23. The plaintiff, for many years, has regularly spent upwards of $1 million annually in exploiting its fabrics and its labels. It maintains promotion, publicity and advertising departments.

24. The promotion department prepares and distributes information about Forstmann fabrics among garment manufacturers and retail stores. It also arranges for some unnamed manufacturer to make up, for promotion and advertising displays, a limited number of garments of fine design, style and workmanship. These garments remain the property of the plaintiff until disposed of privately; they are never offered for public sale.

25. The publicity department prepares and distributes information about Forstmann fabrics in new colors to newspaper, magazine, radio and television fashion editors.

26. The advertising department places advertisements in newspapers, magazines and other media of nationwide communication.

27. All advertising and promotional material features the plaintiff's labels in a context which describes and emphasizes the fine quality of the fabrics and their desirability as material for garments.

28. Typical of the advertisements are those which since 1941 have appeared in full pages of the magazines Life, Vogue and Harpers Bazaar. Up until about 1944 these consisted of a photograph of a model wearing one of the specially made garments, together with sketched or photographed swatches of fabric. Superimposed on the latter appeared a copy of one of the plaintiff's labels. About 1944 the form of these advertisements was changed somewhat. Since then,

they have consisted of a photograph of a model wearing one of the specially made garments, against an arresting background of many folds of different colored fabrics greatly enlarged to show the details of weave and texture. In one corner of the advertisement, superimposed on the fabric, appears a copy of one of the plaintiff's labels surmounted by the words "Quality, Craftsmanship, Style." Directly beneath the label appears the legend "This label identifies the finest woolens in the world."

29. The advertisements both before and after 1944 contained statements of which the following examples are typical:

"**Forstmann Woolen**—100% Virgin Wool. Coats, suits and dresses made from these incredibly beautiful Forstmann textures have a way of retaining their original fashion lines right up to the time the clothes are worn out. For virgin wools are living wools—lush, springy, vital—made to enhance lovely young figures in action. Specify beautiful Forstmann woolens—for homemade, ready-made or made-to-order costumes,"

\* \* \* \* \* \*

"**Forstmann**—100% Virgin Wool. That's the way it always is with beautiful Forstmann textures. Coats, suits, and dresses fashioned from them are especially flattering —and remain so after months of hard wear. That's because shapely Forstmann fabrics are all made from living virgin wools—never (like some woolens) of reprocessed or reused wools. Superbly fashioned they retain their flawless fit throughout an active life. Look to the 'life-line' of your every woolen costume—ready-made or made-to-order."

\* \* \* \* \* \*

"**Forstmann**, 100% Virgin Wool. Forstmann virgin wools, you know, are fresh living wools. That's why they can make even the most casual 'little woolen' take on an air of importance. Wear a Forstmann label this summer—in your ready-made costumes, or in those you run up yourself."

\* \* \* \* \* \*

"Forstmann woolens combining superlative quality and workmanship, are shared now with the armed forces. Nevertheless, you'll find a wide selection bearing this famous label at finer shops."

The following are excerpts from typical press releases:

"The illusion of tweed pattern is one of this Fall's big texture stories. Here a city slicker has the gentle luster of broadcloth with the tiny check pattern of a tweed—it is Forstmann's light-as-air suiting suavely cut by Jablow."

\* \* \* \* \* \*

"The charming look of unstudied ease seen in the new Fall fashions is most brilliantly expressed in woolens of lavish beauty. Forstmann underscores this trend importantly by putting emphasis on woolens and worsteds of high embellishment yet unexaggerated surface effect. The 1954 Fall collection weaves color and texture magic in many ways. It may be through the deft use of rare fibers combined with wool, both in the body of the fabric and on the face—or a decorative accent of fur or pure silk."

The full text from which the latter excerpt is quoted, discusses also the following matters: versatile color schemes in wool; the opulent touch of textures; the finesse of tweeds.

30. In the context of the advertisements, the words "Quality, Craftsmanship, Style" above the label refer to and describe only the plaintiff's fabrics. They do not refer to or describe garments as such, in which the plaintiff's fabrics are used.

31. There has been great demand for the plaintiff's fabrics. However, it has not sold to all who sought to buy from it. The plaintiff has always sought to

have its fabrics, name, trade-marks and labels associated in the minds of consumers with garments of good quality. Accordingly, in selecting customers it has preferred to sell to garment manufacturers whose products it considered to be of good style, design and workmanship. However, as later findings show, the plaintiff, in practice, has deemed it to be consistent with this policy and in keeping with its standard to accept as customers, manufacturers of "medium quality" garments as well as those whose garments were in the "better quality" class; and others.

32. The plaintiff's customers included large garment manufacturers, department stores which sold piece goods and jobbers of piece goods who sold to custom tailors and small garment manufacturers. The manufacturers to whom plaintiff sold were in both the "better quality" and the "medium quality" classes, the former being in the majority.

33. Garments made by its customers and bearing the plaintiff's labels were sold in both "better quality" and "medium quality" retail shops and similar sections of department stores. Retailers, in their advertising, frequently featured the plaintiff's name and labels.

34. The plaintiff did not know who bought its fabrics and received its labels from department stores and jobbers; or the classification of the garments made by such buyers.

35. The plaintiff urged the manufacturers among its customers to affix its labels in their garments, and most of them did so. Some, including "better quality" manufacturers, did not. Each manufacturer who used Forstmann fabrics also affixed his individual label which identified him rather than Forstmann as the maker of his garments. As far as appears, no manufacturer who failed to use the plaintiff's labels was thereafter rejected as a customer because of such failure.

36. There is considerable price overlap between the highest class and the middle class and between the latter and the lowest class. Accordingly, there is no specific price which distinguishes the bottom of the "better quality" class from the top of the "medium quality" class, which are the two involved in this litigation.

37. There is also a considerable range of prices within each class. These variations are the result of several factors among which are the following: quality and cost of basic and complementary fabrics; style; design; quantity and quality of trimming; quantity and quality of hand work. At the retail level, the retailer's standing in the industry, his location and his mark-up policy are also important factors.

38. The prices of garments made of the plaintiff's fabrics by its manufacturer customers and bearing the plaintiff's labels varied widely both at wholesale and retail. During the period here material, such garments retailed at prices which ranged from $30 to $300. There was no evidence that the plaintiff fixed, or participated in any way in determining, those prices.

39. The plaintiff knew that "medium quality" manufacturers among its customers affixed its labels in their garments. The plaintiff did not withhold or demand return of its labels from any of such customers, and it took no other measures to prevent its labels from being affixed by such customers in any of their "medium quality" garments regardless of the price (within the "medium quality" range) at which such garments were sold.

40. The plaintiff's trade-marks and its labels signify fabrics of "better quality." They have only the same but no wider significance when they appear in a garment. They do not signify that the garment as such, in which they appear, is in the "better quality" class.

The Defendant's Practices.

41. The defendant, since its incorporation in 1947, has manufactured only "medium quality" or "popular price" garments which it sold wholesale at prices ranging from $24 to $59. The defendant enjoyed a good reputation in

the ladies' garment industry. It received favorable publicity and its garments were sold throughout the United States by many well-known department stores. Many of the latter featured the defendant's name in their own advertising, as the manufacturer of the garments they offered for sale.

42. From the time it commenced business in 1947, the defendant, though never a customer of the plaintiff, manufactured ladies' suits of one of the plaintiff's most popular fabrics, which is known by the name Milateen. The defendant also manufactured suits of fabrics made and sold by competitors of the plaintiff.

43. The defendant first tried to buy Milateen from the plaintiff in August, 1948. The plaintiff did not accept the defendant as a customer.

44. The defendant at all times purchased Milateen, at prices higher than the plaintiff charged, from manufacturers and jobbers who were customers of the plaintiff and from brokers. The defendant in newspaper advertisements made offers to these sources to "take all quantities and the price will open your eyes!"

45. The defendant admittedly recognized, and desired to get the benefit of, the good will attached to the plaintiff's name, trade-marks and labels in order to facilitate the sale of its suits made of Milateen. The defendant accordingly sought and received from its suppliers quantities of the plaintiff's labels.

46. While there was no direct evidence that the defendant ever saw the plaintiff's contract provisions set out above as to labels or the warnings on the plaintiff's label containers, it is incredible that the defendant was ignorant of the plaintiff's label policy which was well established. It is likewise incredible that the defendant's suppliers in every instance removed the labels from the plaintiff's containers before delivering them to the defendant, or in every instance removed the warning notices from the containers, and there was no testimony that they did so.

47. It is a reasonable inference and I find accordingly that the defendant knew that the plaintiff's labels, which it sought and acquired, were the property of the plaintiff which had delivered them to its own customers subject to the contract limitations set out above.

48. The defendant knowingly and deliberately induced customers of the plaintiff to violate their contracts with the latter.

49. The defendant, although it never received the plaintiff's permission or consent to do so, affixed the plaintiff's labels in garments made of Milateen.

50. The defendant did not always succeed in getting as many of the plaintiff's labels as it needed for the number of suits which it made out of the Milateen it acquired. In order to make up for the deficiency, the defendant had other labels made which it used as substitutes for the plaintiff's. These substitutes, which were of different texture, were clearly distinguishable from the plaintiff's labels in other respects also. The outlined fleurs-de-lis were omitted from the substitute labels and their legends, which were different, were printed in type styles which differed from those used in the plaintiff's labels. The legends were in two forms. One read, "Forstmann Milateen 100% Virgin Wool." This was a combination of the words used in the plaintiff's second and fourth trade-marks. No label of the plaintiff combined the words of these two trade-marks, and no such combination appears in any of the plaintiff's advertising, promotional or publicity material in evidence. The second legend read, "The fabric in this Suit is Forstmanns [sic] Milateen." No label of the plaintiff contained such legend.

51. The basic fabric in every garment in which the defendant affixed either one of its substitute labels or a label of the plaintiff was in fact, and as represented, Milateen manufactured by the plaintiff.

52. The substitute labels, as well as the plaintiff's labels, when affixed by the defendant in its garments constituted

true statements of fact as to the source of the basic fabric in such garments.

53. The defendant also affixed in each of its garments an additional label which clearly indicated that the garment had been manufactured by the defendant. The latter did not represent or suggest, either directly or indirectly, that its garments had been manufactured by the plaintiff. On the contrary, the defendant strove, by means of extensive publicity, to achieve recognition as the manufacturer of its garments which it claimed to be of good "medium quality."

■ As prior findings show, the plaintiff never gave its customers title to its labels, and the defendant's possession of some of them came about solely through breaches of contract which the defendant induced the plaintiff's customers to commit. Accordingly the plaintiff is entitled to have the defendant restrained from appropriating the plaintiff's labels and also from inducing customers of the plaintiff to breach their contracts by selling or giving the plaintiff's labels to the defendant or others unless authorized to do so by the plaintiff.

There remain to be considered the claims of trade-mark infringement and unfair competition. In considering the first of these it must be noted, we have here no question of "palming off" the goods of another as those of the plaintiff, since each garment bore a label which clearly showed the defendant, not Forstmann, to be the maker.

54. No ordinarily intelligent purchaser was, or could possibly be, confused or misled into the belief that Forstmann was the maker of the defendant's garments.

■ . The defendant, under the doctrine of Prestonettes, Inc., v. Coty,[2] was, in the circumstances here found to exist, entitled to inform consumers through the plaintiff's name and mark that the basic constituent of its garments was fabric manufactured by Forstmann. And so it must be held here as it was in Forstmann Woolen Co. v. J. W. Mays[3] that the defendant has not infringed the plaintiff's trade-marks.

The plaintiff does not rest its claims on its trade-marks alone but also on the defendant's alleged "unfairness" in manufacturing, selling and inserting the plaintiff's labels in "garments made of plaintiff's trade-marked fabric MILATEEN which were not of a quality or workmanship and style comparable to the workmanship and style in suits manufactured of the same trade-mark fabric by plaintiff's customers and sold in the better and higher priced quality retail stores and in the better and higher priced quality departments of department stores."

■ It is, of course, obvious from the facts already found that the defendant's "medium quality" garments were not "comparable" to garments of "better and higher priced quality." But it is difficult to see how this circumstance constituted unfair competition. The same was true of garments made by "medium quality" manufacturers who were regular customers of the plaintiff. The plaintiff is not, has never claimed to be and was not at any time believed by consumers to be, a garment manufacturer; and its label is not a symbol of a garment's classification. Thus, in the Milateen suits which the defendant produced, the absence of those features which customarily are found in "better quality" suits was not and could not be attributed to the plaintiff. The consumer was clearly informed that Sices, not Forstmann, manufactured the suits and was therefore responsible for the deficiency, if any, in design, style and workmanship. Accordingly, it was not unfair competition for Sices to inform consumers through use of the plaintiff's name and mark that the basic fabric in its suits was Forstmann's Milateen. See Champion Spark Plug Co. v. Sanders[4]

2. 264 U.S. 359, 44 S.Ct. 350, 68 L.Ed. 731.

3. D.C., 89 F.Supp. 964.

4. 331 U.S. 125, 67 S.Ct. 1136, 91 L. Ed. 1386.

and Forstmann Woolen Co. v. J. W. Mays, supra.

In any event, the following facts also require rejection of the plaintiff's contention as to unfair competition.

55. The plaintiff did not prove that garments manufactured by the defendant were, in general, inferior in quality to similarly priced garments of "medium quality" produced by manufacturers who were customers of the plaintiff. The most the plaintiff proved, and this only by accepting at full value the opinion of the three hardly disinterested Forstmann officials who were the only witnesses called to testify to it, was that one particular Sices suit (Ex. 29) which retailed at about $69 reflected poorer style and workmanship than one particular suit (Ex. 47) made by a "medium quality" customer of the plaintiff. The latter suit sold at $59 wholesale and in the opinion of Forstmann's sales manager "would retail anywhere from $80 to (* * *) $100, depending on the store and where [i. e. in which department of the store] it was carried."

As the following findings show, the defendant failed to sustain its defenses of laches, acquiescence and waiver, and they must be dismissed.

56. The plaintiff at all times has been alert and vigilant in defending its rights and, when necessary, has sought the aid of courts in protecting its good name and the valuable good will which its name, trade-marks and labels have acquired.

57. Some of the plaintiff's manufacturer customers at times resold Forstmann fabrics in the piece and, in disregard of the contract restrictions, delivered to the purchasers the plaintiff's labels. In order to ascertain the identity of such violators, the plaintiff from time to time had special identifying marks placed on the underside of the labels and kept records of those who received them. There was no evidence that the plaintiff refused to resell to customers who violated their contracts by giving or selling the plaintiff's labels to others, but the plaintiff always promptly remonstrated with and tried to persuade such customers to desist.

58. The plaintiff also learned that at times its labels had been affixed, but not by the present defendant, in garments made of fabric which was not of plaintiff's manufacture. In such instances the plaintiff promptly investigated and remonstrated with the offenders who thereupon, as a rule, removed the labels and discontinued using them. If they did not, the plaintiff brought suit.

59. The plaintiff did not acquiesce in the defendant's use of the plaintiff's labels or the substitute labels. When the plaintiff learned that its own and the substitute labels were being used by the defendant, it promptly tried to persuade the defendant to desist. When its efforts failed, the plaintiff seasonably commenced the instant suit.

The defendant wholly failed to sustain its fifth and sixth separate defenses. Accordingly these defenses must be dismissed.

The evidence did not show any measurable damages to the plaintiff and so no accounting will be ordered. See Champion Spark Plug v. Sanders, supra, and Triangle Publications, Inc., v. Rohrlich.[5]

### Conclusions.

1. The defendant has not infringed the plaintiff's trade-marks.

2. The defendant has not competed unfairly with the plaintiff.

3. The plaintiff has not been guilty of laches and has not acquiesced in, or waived its rights with respect to, the defendant's appropriation of and use of the plaintiff's labels.

4. The plaintiff is entitled to an injunction restraining the defendant from inducing the plaintiff's customers to breach the label provisions of their contracts with the plaintiff; from acquiring or using without the plaintiff's consent, the latter's labels or exact repro-

5. 2 Cir., 167 F.2d 969.

ductions thereof; and directing the defendant to turn over all labels of the plaintiff to the latter if any are still in the defendant's possession or control.

5. The plaintiff is not entitled to damages, an accounting or attorneys' fees.

A decree in accordance with this opinion may be submitted on notice.

### Supplemental Opinion.

McGOHEY, District Judge.

Counsel have called attention to an inaccurate statement in the original opinion herein filed on August 30, 1956, to wit: "The defendant wholly failed to sustain its fifth and sixth separate defenses."

The fact is that on motion made long before trial the fifth defense was ordered stricken as insufficient, with leave to amend. No amendment was made. Accordingly, the original opinion is hereby corrected so as to read "The defendant wholly failed to sustain its sixth defense. Accordingly, this defense must be stricken."